IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| DAVID DUTCH and SHEREE DUTCH, husband and wife, | ) | CIVIL ACTION NO.: 26-1141 |
| | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Defendant. | ) | |

**COMPLAINT**

Plaintiffs, David Dutch and Sheree Dutch, husband and wife, by and through their attorneys, the Feldman Law Group PLLC and Speiser Krause, PC, respectfully allege as follows:

**PRELIMINARY STATEMENT**

1.    Plaintiffs, David Dutch and his spouse, Sheree Dutch, suffered severe, significant, permanent and grievous physical, personal and other injuries when Plaintiff David Dutch was shot and severely and grievously wounded while attending a presidential campaign rally on July 13, 2024 at approximately 6:11 p.m., near Butler, Pennsylvania, at the Butler Farm Show Grounds, for then-candidate and Former President Donald J. Trump, and now President of the United States of America Donald J. Trump (referred to as "President Trump").   As detailed herein, plaintiffs' injuries were caused by the negligence, recklessness and/or carelessness of the United States Secret Service and/or the Department of Homeland Security (collectively the "USSS"), their employees, agents, servants and/or representatives, including, federally-employed Secret Service Special Agents, for whom the defendant United States of America is responsible (jointly and severally), assigned to the Butler Presidential Rally to provide, amongst other things, security to ensure the

1

safety of all persons in attendance at the Butler Presidential Rally, specifically including President Trump and the plaintiffs herein, and said individuals utterly failed to provide required, proper, appropriate, timely and/or necessary security and/or other services and/or to fulfill their responsibilities at the Butler Presidential Rally and in advance of the Butler Presidential Rally, which failures proximately caused, in whole or in part, the shooting complained of herein.

2.     The attempted assassination of President Trump appropriately garnered worldwide attention as well as spawned criminal investigations and Congressional inquiries investigating the events that led to the shooting.  As detailed herein, and as set forth in the Congressional investigations, due to the failures of the USSS, a twenty-year old individual who was observed to be acting erratically in the hours before the shooting, and was the subject of an intensive search, managed to climb onto the roof of a building and fire eight shots before being killed by a counter-sniper. The shots fired by the would-be assassin injured (and almost killed) President Trump, killing another individual and severely wounding two others, specifically including the Plaintiff David Dutch, causing him and his spouse, Plaintiff Sheree Dutch, debilitating, grievous, permanent and life altering physical and emotional injuries.

3.     The defendant United States of America, by and through the USSS, committed egregious failures and failed to abide by and adhere to various protocols, policies and procedures which directly and proximately caused the shooting and/or allowed it to occur.   As detailed herein, these failures include, but are not limited to, the USSS's failure to secure the roof of a building and mitigate the line of sight threat posed by the building and those who might occupy or mount it, communication issues which resulted in fragmented, inadequate and improper lines of communication between the USSS and others thereby preventing the timely and proper dissemination of critical security information leading up to the assassination attempt, the failure of

2

the USSS to locate and question the would be assassin despite that it was known that he was acting erratically, had used a range finder, and was the subject of a search in the hours leading up to the shooting, the failure of the USSS to alert anyone from President Trump's security detail regarding this erratic individual, and technology failures related to the use of drone technology that would have alerted the USSS to the shooter's physical location more than 2 hours prior to the shooting.

4.    Indeed, the USSS has itself acknowledged that its failures included "breakdowns in communication, technological issues, and human failure" all of which contributed to the shooting, and that its conduct constituted "an operational failure that the Secret Service will carry as a reminder of the critical importance of its zero-fail mission and the need for continuous improvement". Further, numerous agents were held accountable for their acts and omissions, including suspension without pay, and those individuals were placed on restricted duty and/or moved into non-operational positions.[1]

5.    Congressional investigations also reviewed the USSS's failures on the day of the assassination attempt, including Senate findings which concluded that the USSS's failures directly led to the shooting complained of herein, including, but not limited to, that the USSS's conduct consisted of a "cascade of preventable failures"; that the Secret Service's conduct revealed a "disturbing pattern of communication failures and negligence that culminated in a preventable tragedy"; and that there were multiple, unacceptable failures in the [Secret Service's] planning and execution of the Butler Presidential Rally.[2] An investigation by a Task Force formed in the House

---

[1]    *See,*    https://www.secretservice.gov/newsroom/releases/2025/07/us-secret-service-one-year-update-following-july-13-2024-attempted

[2] *See,* Final Report of the United States Senate Committee on Homeland Security & Governmental Affairs, "One Year Later: The U.S. Secret Service's Failures Surrounding the July 13, 2024

of Representatives likewise concluded, amongst other things, that the USSS committed a multitude of failures which directly led to the shooting, including that "evidence clearly shows failures in advance planning by the Secret Service . . . and failures in execution on the day of the event itself"; and that the various failures in planning, execution and leadership, on and before July 13, 2024, created an "environment in which the [then] Former President – and everyone at the campaign event – were exposed to grave danger."[3]

6.      As a result, due to the negligence, recklessness and/or carelessness of the USSS (for which defendant United States of America is responsible), the defendant United States of America is jointly and severally liable for Plaintiffs' injuries with no negligence whatsoever on the part of the Plaintiffs contributing thereto.

## PARTIES, JURISDICTION AND VENUE

7.      At all times relevant, Plaintiff David Dutch was and is a citizen and resident of the State of Pennsylvania, maintaining his residence within this judicial district, and specifically in Allegheny County.

8.      At all times relevant, Plaintiff Sheree Dutch was and is a citizen and resident of the State of Pennsylvania, maintaining her residence within this judicial district, and specifically in Allegheny County.

---

Assassination Attempt", which can be accessed at https://www.hsgac.senate.gov/wp-content/uploads/USSS-Chairman-Report-Final-July-20254.pdf

[3] *See,* United States House of Representatives Final Report issued by the Task Force on the Attempted Assassination of Donald J. Trump, which can be accessed at https://fallon.house.gov/uploadedfiles/tf.finalreport.pdf

9. At all times relevant, Plaintiffs David Dutch and Sheree Dutch were and are legally married and continue to be legally married, and reside together within this judicial district, specifically in Allegheny County.

10. Defendant United States of America ("United States") is a defendant in this action pursuant to 28 U.S.C § 1346 (b) and 28 U.S.C. §§ 2671, et seq., commonly referred to as the "Federal Tort Claims Act", in that the claims which give rise to this action are against the defendant United States.

11. Plaintiffs have complied with the administrative prerequisites regarding filing suit against defendant United States in that on March 31, 2025, plaintiffs served upon the defendant United States Notices of Claim (Standard Form 95s) on behalf of each plaintiff, each of which were received by agencies of the defendant United States, namely, the United States Secret Service and the Department of Homeland Security, on April 1, 2025.

12. The defendant United States has not taken any action with respect to the aforementioned Form 95s, nor did it serve any formal response either accepting or denying any of the aforementioned claims within six months of filing, as set forth in 28 U.S.C. § 2675(a). More than six months have elapsed since the filing of the aforementioned Form 95s, and this therefore constitutes a final denial of the claims entitling Plaintiffs to file this Complaint pursuant to 28 U.S.C. § 2675(a).

13. Pursuant to 28 U.S.C. § 1402(b), venue of the claims against defendant United States is proper in the United States District Court for the Western District of Pennsylvania, Pittsburgh Division, in that the shooting and the negligent acts and/or omissions of the USSS occurred within this federal district, including within Pittsburgh, Pennsylvania. In addition, the Plaintiffs are residents of this judicial district. Copies of the Form 95s filed on behalf of plaintiff

5

David Dutch are attached as Exhibit "A". Copies of the Form 95s filed on behalf of plaintiff Sheree Dutch are attached as Exhibit "B"; and each of the aforementioned exhibits are incorporated herein by reference.

## GENERAL ALLEGATIONS APPLICABLE TO ALL COUNTS

14.    Plaintiffs incorporate by reference paragraphs 1 through 13 as though fully set forth at length herein.

### A.    Background

15.    The assassination attempt on President Trump's life was entirely preventable and was caused, in whole or in part, by the failures of the USSS in the days leading up to the event as well as on the day of the assassination attempt.   These failures were egregious and the facts and circumstances leading to the shooting demonstrated a complete and utter failure on the part of the USSS to protect the life of a former President and the leading Republican candidate in the presidential race.   Had the USSS followed mandatory policies and procedures the shooting would not have occurred, thereby saving Plaintiffs from a life altering tragedy which has resulted in significant, grievous and permanent personal and other injuries.

16.    The USSS uses a model of site security preparation known as the "advance", which entails various elements of the USSS visiting a site in the days before a planned event to assess security risks and develop a plan to mitigate those risks.   This is referred to as the "Site Security Plan" and is coordinated and overseen by an agent of the USSS, referred to as the "Site Agent".

17.    The Site Agent works with other agents from the USSS (and local law enforcement) to, among other things, assign tasks for site security.

18.    This process includes, but is not limited to, a "kick-off" meeting where the USSS meets with other law enforcement agencies to provide an overview of the event, assess the level

6

of resources needed for site security, and assess the extent to which local law enforcement, if any, has resources to contribute to site security.

19.    This process continues in the days leading up to the event with various site "walkthroughs" conducted by the USSS, along with law enforcement partners, to assess sight security with "on-the-ground" observations.

20.    These efforts result in the USSS developing and implementing a final Site Security Plan, which is reviewed by the detail's operations section, and is also shared with the Protectee's detail. The responsibility to develop and implement the Site Security Plan rests solely with the USSS, and it is ultimately responsible for all security at the particular event.

**B.    <u>Events leading up to the Butler Presidential Rally on July 13, 2024</u>**

21.    On or about July 2, 2024, the Secret Service assigned to President Trump (referred to as the "USSS Trump Security Detail") notified the USSS, specifically including the USSS's Pittsburgh Field Office, located in Pittsburgh, Pennsylvania, of a potential campaign stop in western Pennsylvania tentatively scheduled for July 13, 2024.

22.    As a result of this notification, the Pittsburgh Field Office began assigning personnel to this potential visit, and soon thereafter the public was informed that President Trump would make a campaign stop in western Pennsylvania.

23.    On or about July 4, 2024, the Trump USSS Security Detail advised the USSS that the upcoming Presidential Rally would take place at the Butler Farm Show Grounds located near Butler, Pennsylvania, a vast privately owned property consisting of approximately 100 acres with open access to the public with at least seven different entrances.

24.    On or about July 5, 2024 advance planning for the Butler Presidential Rally began consisting of an email sent by the USSS to various state and local law enforcement agencies and

counterparts (collectively referred to as "LLE"), inviting them to a meeting or "kick-off event" on July 8, 2024, to discuss the rally.

25.     On or about July 8, 2024, the USSS conducted a "walkthrough" of the Butler Farm Show Grounds with numerous individuals, including President Trump's campaign staff, where several security items were discussed, including, where the stage would be located as well as line of sight mitigation to prevent any attempted assassination of President Trump. Pursuant to USSS policies and procedures, line of sight mitigation is essential in protecting a "Protectee", such as President Trump, to block potential threats – such as a gunman – from elevated or concealed positions with a clear line of sight to the Protectee.

26.     In continuing its advance preparations for site security, the USSS, on or about July 9, 2024, met with LLE including representatives from the Pennsylvania State Police ("PSP"), and this meeting specifically included a discussion of the AGR Complex (a building and grounds located on the Butler Farm Grounds).

27.     The AGR Complex required special attention given its proximity and clear line of sight to the stage where President Trump was to address the rally.

28.     The meeting on July 9, 2024 between the USSS and LLE and PSP set the stage for a series of communication failures between the USSS and its law enforcement partners, including which entity was responsible for securing the AGR Complex; despite that the USSS is responsible for site security, the USSS believed that LLE and PSP would secure the AGR site, whereas LLE and PSP denied that there was any discussion as to which entity was responsible for the AGR Complex, specifically including the AGR Building.

29.     Notwithstanding that USSS policies and procedures mandate that it is responsible for site security involving a Protectee, such as President Trump, this unacceptable lack of

8

understanding as to who was responsible for securing the AGR Building set in motion the events that ultimately allowed an individual by the name of Thomas Crooks (the "Shooter" or "gunman") to climb onto the roof of the AGR Building which in turn, allowed him to fire eight shots at President Trump, one of which severely, permanently and grievously injured Plaintiff David Dutch.

30.    On or about July 10, 2024, the USSS conducted yet another walkthrough of the Butler Farm Show Grounds apparently for the purposes of undertaking a workforce assessment for site security.

31.    This July 10, 2024 walkthrough led to additional unacceptable lack of communication and inadequate planning; despite that the USSS was responsible for site security at the Butler Presidential Rally, it believed that LLE would, amongst other things, provide police, patrol cars, and counter-sniper teams and that there would be various obstructions of line of sight from the AGR Complex to the stage where President Trump was to speak. This, however, was not the case, and despite that the AGR Complex was discussed during this walkthrough, there was an unacceptable lack of communication and coordination as to which agency would secure the AGR Complex.

32.    On the next day, July 11, 2024, the USSS again met (for the last time in advance of the event) with LLE at the site of the Butler Presidential Rally.  Line of sight mitigation issues were again purportedly discussed at this time, including with President Trump's USSS Security Detail.  The communication failures and lack of understanding that were evident from prior meetings continued during and after the July 11, 2024 meeting.  As an example of this unacceptable lack of communication which resulted in inadequate security for President Trump and all the event attendees, the USSS believed that LLE and PSP would provide more patrol and

9

a heightened police presence around the AGR Complex; LLE and PSP apparently advised that they did not have the resources to accomplish this objective.

33.     The next day, July 12, 2024, the USSS met with President Trump's campaign staff. It is believed that this meeting also discussed security issues at the Butler Presidential Rally including, but not limited to, line of sight mitigation from the AGR Complex to the stage from which President Trump would speak the next day, including possibly placing large farm equipment between the AGR Building and stage to mitigate these line-of-sight concerns.

34.     On the same day, and despite that security at the Butler Presidential Rally was the responsibility of the USSS, LLE completed its site plan for the event, but it was not sent to the USSS nor did the USSS ask to see or review the plan.

35.     The USSS likewise finalized is Site Security Plan, which failed to include line of sight mitigation from the AGR Complex despite that this was discussed on numerous occasions leading up to the Butler Presidential Rally.

C.     **Events on July 13, 2024 – Day of the Trump Assassination Attempt**

36.     Despite that numerous meetings were held prior to July 13, 2024 concerning site security at the Butler Presidential Rally, there remained an extraordinary and unacceptable lack of adequate advance planning and communication, including the failure of the USSS to properly delineate and define appropriate security responsibilities, establish and implement an appropriate Site Security Plan, and mitigate line of sight concerns, specifically including the failure on the part of the USSS to ensure that the AGR Complex was secured, especially given its close proximity to the event and that a direct line of sight (of approximately 400 feet) existed from that complex to the stage where President Trump was to deliver his remarks. These failures were compounded by

10

the failures on the day of the event, all of which caused and/or contributed to the shooting in which Plaintiffs suffered grievous injuries.

37.    On July 13, 2024, a mere hours before President Trump was to address the rally, LLE and the USSS each conducted separate security meetings, and no personnel from the USSS attended the LLE security briefing leading to further confusion and misunderstanding of security responsibilities and communication methods and protocols.

38.    On the day of the event, the USSS set up a communication and command center on the rally grounds (the "USSS Security Room" or "Security Room").  Contrary to policy and procedure, and notwithstanding that LLE was delegated by the USSS to provide, amongst other things, site security, no LLE personnel were located within the USSS Security Room.  Rather, only a representative from the PSP was located within and in direct contact with agents of the USSS in the Security Room.

39.    In addition, LLE set up its own separate command center in a trailer on the property which was not staffed by USSS personnel.  These separate command centers resulted in fragmented, improper and inadequate lines of communication between LLE, PSP and the USSS, and these communication failures were critical on the day of the rally, especially in the moments leading up to the shooting.

40.    Contrary to established policies and procedures, the USSS had an unacceptable and incomplete understanding of the command center established by LLE as the USSS believed that the trailer was to be used only for medical emergencies and line of sight mitigation, however, the LLE command center served as a critical communications post where vital information concerning site security was shared.

11

41.     Further contributing to the inadequate and fragmented communication issues, radio communication failures occurred within the LLE trailer which required an individual in the trailer to communicate with the PSP representative who was located within the USSS Security Room by cellular telephone. This caused delayed communications as well as inhibiting sensitive security information from being widely and timely disseminated.

42.     Technology failures on the day of the Butler Presidential Rally were rampant. In addition to the unacceptable radio/communication failures, a drone used by the USSS – which is specifically designed to detect the presence of other drones and alert the USSS – was inoperative during a critical period when the Shooter operated a drone over the rally grounds.

43.     As part of its security responsibilities, the USSS employs a counter-unmanned aerial system (C-UAS) to monitor drone activity at a particular event. It was intended that the C-UAS would be used for security purposes at the Butler Presidential Rally.

44.     When deployed, the C-UAS can detect if another drone is being used in the vicinity or to surveil an event.   If the C-UAS detects other drone activity, an alert is sent to the USSS that a drone has been detected, and it also provides the location of the drone pilot/operator who could then be questioned by USSS personnel.   It is also believed that in the days leading up to the Butler Presidential Rally, the USSS advised LLE that certain of its officers would likewise receive an alert from the C-UAS to assist in investigating any suspicious drone activity.

45.     On the morning of the Butler Presidential Rally, however, the C-UAS was inoperative.   It is believed that the USSS agent assigned to operate the C-UAS had limited "drone" experience and he spent most of the morning and early afternoon on July 13, 2024 on the telephone with the manufacturer's "800 number" to troubleshoot the issue.   The C-UAS did not become operable until approximately 4:30 p.m. on the day of the event.

12

46.    While the C-UAS was inoperative, however, and at 3:51 p.m., the Shooter flew a drone over the rally site for close to 12 minutes.  This allowed the Shooter to have unfettered views of the stage, podium, and surrounding area where President Trump was going to speak.

47.    Had the C-UAS been operational at this time, as it should have been, the C-UAS would have detected the Shooter's drone use and notified the USSS and others of the location of the Shooter almost two and one-half hours prior to the shooting.  Undoubtedly, the USSS could then have interviewed the Shooter, and in all likelihood, this would have prevented the shooting. The C-UAS ultimately became operable at approximately 4:30 p.m., but by this time, it was too late as the Shooter had already completed his drone surveillance.

48.    Unacceptable radio issues persisted throughout the day, including that certain USSS agents were hearing communications on their radios from an event taking place in Pittsburgh, Pennsylvania involving then First Lady of the United States Jill Biden.  As a result, certain USSS agents were directed to switch frequencies thereby exacerbating the improper and inadequate lines of communication that persisted throughout the day.

49.    President Trump arrived at the rally at approximately 5:30 p.m.

50.    Prior to President Trump's arrival, however, and by no later than 5:00 p.m., LLE noticed the Shooter acting erratically, and his behavior raised suspicion. It is believed that this assessment was made independently by several different LLE personnel, but these suspicions were not communicated to the USSS at that time, in part, due to the above-mentioned communication issues.

51.    Apparently, contrary to policy and procedure, the USSS's Site Security Plan failed to include required common communication channels so that all agencies were aware of issues

involving a potentially dangerous individual.   Shortly after 5:00 p.m., LLE took pictures of the Shooter and circulated those pictures to other LLE personnel.

52.    At approximately 5:10 p.m., the Shooter was again seen by LLE personnel, but this time, the Shooter was observed using a range finder from his position near the AGR Complex to the stage where President Trump was to speak.

53.    As a result, and likely because the use of a range finder by an erratic individual at a Presidential Rally caused alarm, LLE began an active search for the Shooter, and one LLE officer observed the Shooter via binoculars moving in and out of sight by the AGR Complex.   LLE continued their active search for the Shooter until approximately 5:40 p.m. At this time, an LLE officer texted several LLE counter-snipers advising them of the Shooter and further advised that those individuals "could" notify the USSS of this suspicious individual.

54.    Had the USSS's Site Security Plan included required and proper communication channels, the USSS would have been contemporaneously aware of LLE's concerns regarding the Shooter.

55.    By approximately 5:42 p.m., an LLE counter sniper advised individuals in the LLE trailer about the Shooter, including his description and the fact that he previously used a range finder.   Shortly thereafter, LLE contacted the PSP officer located in the USSS Security Room via cell phone to advise of the Shooter.   The LLE caller heard the PSP officer discussing this information with others in the USSS Security Room.   This information was also shared by LLE with USSS counter sniper personnel which included a "Be on the Lookout" ("BOLO") for the Shooter. Contrary to USSS policies and procedures this information was not widely disseminated to all USSS personnel.

14

56. Notwithstanding the foregoing failures, by no later than 5:51 p.m. (approximately 20 minutes before the shooting), several USSS agents were aware of the Shooter including his prior movements and description. Despite this knowledge, and contrary to policy and procedure, this information was not widely disseminated to other USSS personnel, and due to the other inoperable and fragmented methods of communication between LLE and the USSS, the USSS agents assigned to the Security Room were not previously aware of the suspicious behavior exhibited by the Shooter. Nonetheless, by this time (5:51 p.m.) certain USSS agents located in the USSS Security Room were aware of, and had received photos of, the Shooter.

57. At no time whatsoever was the information regarding the Shooter communicated by the USSS to President Trump's USSS Security Detail notwithstanding that the Shooter was acting erratically and that he was previously observed using a rangefinder.

58. Shortly after 5:51 p.m., the Shooter was again observed near the AGR Complex, but no LLE or USSS personnel confronted the Shooter at this time. It was at this same time that LLE observed that the Shooter continued to act erratically and he was observed "running". This information was transmitted over the LLE radio system, but due to the inadequate communication plan established by the USSS's Site Security Plan, and the fragmented lines of communication, this information was not widely publicized to the USSS.

59. Between 6:00 p.m. and 6:09 p.m., several USSS agents (including senior USSS personnel) entered the USSS Security Room. Despite that USSS personnel within the USSS Security Room were specifically aware of the Shooter by no later than 5:51 p.m., those agents who began entering at 6:00 p.m. and after were not advised or made aware that an active search was ongoing for a suspicious individual identified as the Shooter.

15

60. At approximately 6:05 p.m. (6 minutes before the assassination attempt), the Shooter, with a weapon, climbed onto the roof of a Building located in the AGR Complex by scaling air conditioning units located near the roof. This was observed by several rally attendees who attempted to advise LLE of the Shooter's presence on the roof.

61. From 6:05 p.m. through 6:08 p.m., the Shooter was observed moving across multiple roofs of buildings within the AGR Complex. However, due to the USSS' inadequate Site Security Plan no law enforcement personnel were assigned to monitor or secure the roof of buildings located at the AGR Complex. This was a blatant violation of USSS policy and procedure, especially given that the roof allowed a direct line of sight to the stage where President Trump was to speak, and the USSS knew and had discussed this risk on numerous occasions but failed to mitigate these line of sight concerns.[4]

62. At approximately 6:08 p.m. – and after President Trump had already taken the stage - an LLE officer approached the AGR Complex and observed the Shooter on the roof. He then radioed this information to other LLE personnel but due to the inadequate and fragmented lines of communication, this transmission was not contemporaneously heard by the USSS.

63. Approximately one minute later, at 6:09 p.m., personnel within the USSS Security Room were specifically made aware that a suspicious individual was on the roof of an AGR Building. Using a cell phone, LLE called the PSP officer stationed in the USSS Security Room advising him of this development.

64. In addition, at approximately the same time, a USSS agent "manning" a post was made aware of the Shooter by LLE, and he advised LLE that the USSS will speak with this person

---

[4] Apparently, LLE personnel were stationed within the AGR Building but from that vantage point those officers could not have prevented the shooting, nor did they have any responsibilities related to securing the roof of the building.

if LLE could locate him.  The USSS agent did not widely disseminate the information that he received from LLE.

65.    Shortly after 6:09 p.m., an LLE officer decided to pursue the Shooter to determine what he was doing on the roof.  With the assistance of another officer, he was hoisted up and observed the Shooter with an assault rifle which he pointed at the officer.

66.    Upon observing the rifle, the officer fell to the ground.  He immediately shouted on his radio that the person on the AGR roof was armed with an assault rifle. Despite this transmission, neither this – or any information concerning the Shooter – was ever relayed to President Trump's USSS Security Detail.   The failure to alert President Trump's USSS Security Detail of this information impeded their ability to rush the stage prior to shots being fired and was a violation of USSS policy and procedure.

67.    At 6:11 p.m. the Shooter fired eight (8) shots at President Trump, one of which hit the President in his right ear, and another struck Plaintiff David Dutch (who was attending the rally to show his support for President Trump) causing severe, serious and grievous injuries as set forth herein.   It was not until after these eight shots were fired by the Shooter that a USSS counter-sniper returned fire and killed the would-be assassin with a single gunshot.

68.    As a direct and proximate result of the acts and/or omissions of the USSS, for which the defendant United States is jointly and severally liable, Plaintiff David Dutch suffered grievous, serious, permanent and debilitating personal and other injuries including but not limited to: present and future economic and non-economic loss, severe, serious, permanent and grievous personal injuries, pain, suffering, mental anguish, discomfort, inconvenience, distress, embarrassment, humiliation, loss of the ability to enjoy life's pleasures, loss of the marital relationship, disfigurement, medical expense loss both past and future, losses associated with ongoing medical

17

care, loss of earnings and earning capacity, including past and future losses with respect thereto, loss of care, society, consortium, painful and continuing physical and other rehabilitation and therapy, and all of the sequalae therefrom, and was required to undergo severe, serious and painful surgeries and medical care, was admitted to the ICU for in-patient hospital admissions, and was required to undergo numerous surgeries for a gunshot wound ("GSW") including, but not limited to, GSW right upper quadrant with exit wound; right hemopneumothorax; Significant Grade 5 liver laceration extending from segment 4b through 7 with diffuse veinous bleeding; repair of liver laceration and diaphragm injury; liver packing and abthera wound vac; lateral detachment and avulsion of the diaphragm; shattered rib near the projectile wound; diaphragm injury with open wound into cavity; veinous bleeding; ballistic injury to the right hepatic lobe with multiple clips in the right hepatic lobe; multifocal arterial injury to the right hepatic lobe hemothorax; upper lobe pulmonary contusion; large amount of free air in the abdomen and pelvis compatible with recent laparotomy; multiple ballistic fragments in the right 7th and 8th ribs; multifocal arterial injury to the right hepatic lobe; laparotomy, exploratory repair liver laceration; repair of diaphragm liver injury; open puncture wound to abdomen and abdominal washout and abdominal closure; intrahepatic bile leak; placement of numerous drains, tubes, omental and other patches; acute blood loss anemia; acute pulmonary insufficiency; diffuse right lobe liver parenchymal abnormality (hyperemia/delayed washout); remaining bullet fragments and shrapnel; biliary sphincterotomy; painful and continuing diagnostic and imaging testing; colonic anastomosis; transection of colon; transverse end colostomy; abscess repair; staph infection; biliary and pancreatic duct stent and removal; underwent painful inpatient and outpatient rehabilitation, and will be required to undergo additional future surgeries and medical care including rehabilitation, as well as other painful and required surgical procedures, all resulting in additional damages, including, but not limited to, all

18

of the categories and elements of damages set forth above, as well as any other damage allowed under applicable law, all as a result of being shot by a high powered assault rifle at the Butler Presidential Rally on July 13, 2024, with no negligence on the part of Plaintiff David Dutch contributing thereto.

69.     As a direct and proximate result of the acts and/or omissions of the USSS, for which the defendant United States is jointly and severally liable, the Plaintiff Sheree Dutch, suffered damages for past, present and future loss due to the severe, serious, permanent and grievous injuries sustained by her husband, Plaintiff David Dutch, as a result of the shooting complained of herein, including, but not limited to, losses of companionship, consortium, loss of the marital relationship, loss of marital fellowship, losses of company, society, cooperation, affection, support, comfort, assistance, mental and other anguish, loss of sexual relations, economic losses (past and future), and/or bystander, zone of danger or other similar damages, and all of the sequalae therefrom, as well as any other damage allowed under applicable law, all as a result of her husband's injuries sustained at the Butler Presidential Rally on July 13, 2024, with no negligence on the part of Plaintiff Sheree Dutch contributing thereto.

**COUNT I ON BEHALF OF PLAINTIFF DAVID DUTCH**
**(NEGLIGENCE AGAINST DEFENDANT UNITED STATES OF AMERICA)**

70.     Plaintiffs incorporate by reference paragraphs 1 through 69 as though fully set forth at length herein.

71.     The assassination attempt, shooting and injuries of Plaintiff David Dutch, were caused, in whole or in part, by the negligence, recklessness and/or carelessness of the USSS, for which defendant United States is jointly and severally liable in that, amongst other things, the USSS:

19

a.        failed to provide adequate security to the attendees at the Butler Presidential Rally, specifically including to Plaintiff David Dutch;

b.        failed to ensure that the AGR Buildings were secure despite its responsibility to do so, especially because the AGR Complex provided a direct line of sight to the stage where President Trump was to speak;

c.        failed to develop and/or implement an adequate Site Security Plan;

d.        failed to properly conduct advance planning at the site of the Butler Presidential Rally which exposed the attendees at the event, specifically including Plaintiff David Dutch, to grave injury;

e.        failed to mitigate line of sight dangers;

f.        failed to properly and adequately communicate, brief, work with and/or assign LLE to ensure that the attendees at the Butler Presidential Rally were safe;

g.        failed to properly delineate and/or establish responsibilities between LLE and the USSS despite that it was the responsibility of the USSS to do so;

h.        failed to provide appropriate guidance to LLE concerning its responsibilities at the Butler Presidential Rally;

i.        improperly positioned USSS and LLE personnel throughout the Butler Presidential Rally including within the AGR Building, but allowed the roof of the building to remain unsecured providing a prime sniper position for the Shooter;

j.        failed to secure and control the immediate airspace in the vicinity of the rally;

k.        failed to provide and/or utilize required and necessary technology, manpower and/or assets, including, but not limited to, the C-UAS which if properly employed – as was required – would have alerted the USSS that the Shooter operated a drone over the rally site hours

20

before the shooting which would have allowed USSS to interview and question the Shooter thereby preventing the shooting;

l.    failed to and/or inadequately trained the C-UAS operator such that the agent was unprepared for any technical failure(s) of the equipment;

m.    failed, specifically including the C-UAS operator, to test the C-UAS equipment in advance of the rally to ensure that it was operational despite the agent's responsibility to do so, particularly as the USSS alerted others responsible for site security that the C-UAS would be used in the days leading up to the Butler Presidential Rally, creating dependence on a non-existent security asset;

n.    failed to establish proper lines of communication, including, but not limited to, failed to ensure that all law enforcement personnel responsible for site security were communicating appropriately, and/or failed to timely and widely disseminate critical security information;

o.    failed to adequately secure and protect the site of the Butler Presidential Rally (both "inside" and "outside" established perimeters);

p.    failed to secure, monitor and/or control a known and identified high-risk area at the venue of the Butler Presidential Rally, specifically the AGR Building and grounds which, among other things, provided a potential gunman with a clear line of sight to the stage where President Trump was speaking and also provided an elevated position from which to fire shots;

q.    failed to communicate to President Trump's USSS Security Detail prior to the President taking the stage that a suspicious individual was identified at the Butler Presidential Rally, including that a BOLO was issued for said individual who ultimately attempted to assassinate President Trump, injuring Plaintiff David Dutch;

21

r.      failed to advise President Trump's USSS Security Detail of the suspicious behavior of the Shooter after President Trump took the stage so that his security detail could immediately remove him from danger, thereby preventing the shooting;

s.      improperly assigned inexperienced and/or inadequately trained personnel to critical security assignments involving significant security responsibilities for which they were inadequately trained, ill equipped and unable to carry out;

t.      in providing site security at the Butler Presidential Rally, violated numerous USSS policies and procedures, including, but not limited to, USSS Office of Protective Operations ("OPO") Manual OPO-3, OPO-6, OPO-8, SOD-08, the USSS Strategic Intelligence and Information Manual CSD-04, USSS Internal Operating Procedures: Counter Sniper Team Advance Procedures, and other Policy and Procedure Manuals and requirements;

u.      provided improper and inadequate training to USSS personnel assigned to the Butler Presidential Rally;

v.      improperly and inappropriately deferred significant security responsibilities to LLE without appropriate communication despite that it is, and was, the function and responsibility of the USSS to ensure that the Butler Presidential Rally was safe for all attendees;

w.      failed to ensure that USSS counter-sniper agents adequately covered the AGR Complex, especially because of the proximity and direct line of sight from that vantage point to the stage where President Trump spoke;

x.      failed to maintain security over the event, including that even though it was prohibited from delegating ultimate security responsibility, the USSS failed to specifically and/or adequately advise LLE that the security of AGR Complex was LLE responsibility if that was its intention;

22

y.      improperly allowed fragmented, broken and/or inadequate lines of communication to exist which severely impeded the transmission of critical safety and security information prior to the shooting;

z.      improperly allowed separate command posts to be established which further prevented the timely dissemination of critical security information and/or failed to staff USSS personnel within the LLE command post;

aa.     improperly failed to centralize a single command center where information can be timely and appropriately disseminated to all personnel providing security;

bb.     improperly allowed critically important safety communications to take place over cell phones as opposed to radio which impeded and delayed the timely exchange of important security and safety information;

cc.     fragmented communication system prevented USSS personnel from sharing critical information timely and accurately to prevent the shooting, which, amongst other things, allowed certain USSS agents to be made aware of the Shooter but not others, while failing to widely and timely share this information;

dd.     failed to specifically assign either USSS personnel and/or LLE personnel to the roof of the AGR Complex given its proximity and direct line of sight to the stage where President Trump spoke;

ee.     improperly allowed LLE counter-sniper personnel to define their own roles and positions despite that it is the sole responsibility of the USSS to delineate and assign those responsibilities;

ff.     improperly conducted advance site procedures including, but not limited to, walkthroughs to ensure that the AGR Complex was secure;

23

gg.      improperly allowed LLE counter-snipers to be located within the AGR Building as opposed to securing the roof;

hh.      was specifically aware, or should have been aware, that the roofs of buildings located within the AGR Complex were unsecure contrary to policy and procedure;

ii.      improperly failed to assign a USSS counter-sniper team to monitor the AGR Complex and its roofs, especially given its proximity to the event and direct line of sight to the stage;

jj.      despite the USSS's mandate and ultimate responsibility for securing the site for the Protectee and attendees of the event, the USSS utterly failed to develop and implement a proper Site Security Plan to protect all individuals at the Butler Presidential Rally;

kk.      failed to mitigate a clear and direct line of sight to the stage contrary to policy and procedure;

ll.      failed to adequately and timely transmit information to President Trump's Security Detail that would have either prevented President Trump from taking the stage or removed him from the stage prior to the time shots were fired;

mm.      failed to share threat assessment information with the USSS agents responsible for site security at the Butler Presidential Rally, including that President Trump was the subject of death threats;

nn.      improperly missed several opportunities to detain the Shooter despite that it was known that he was acting in a highly suspicious manner well before the shooting;

oo.      due to a lack of manpower, inexperienced personnel from agencies outside the USSS were given significant security responsibilities despite that they were inadequately trained to carry out those responsibilities, all in violation of the USSS's security responsibilities;

24

pp.     the Site Security Plan for the Butler Presidential Rally failed to define clear roles, responsibilities and a chain of command reporting and communication structure;

qq.     the USSS has ultimate responsibility for security planning at protective venues, including specifically the Butler Presidential Rally, and the USSS failed in this responsibility;

rr.     failed to communicate with all LLE's that aided in site security for the Butler Presidential Rally, and this failure allowed unacceptable gaps in the security that the USSS was required to provide;

ss.     the site of the Butler Presidential Rally presented important line of sight concerns which were required to and could have been mitigated by the USSS, but the USSS failed to alleviate or mitigate these concerns;

tt.     failed in key objectives of a Site Security Plan and failed to conduct the necessary and required due diligence to make the site safe for attendees;

uu.     failed in its primary objective of preventing direct line of sight sniper positions which were a known, clear and identifiable threat to President Trump;

vv.     failed in its long-standing mission and failed to implement procedures learned from prior assassination attempts, including that the USSS failed to give heightened attention to certain buildings involving higher risk than others;

ww.     failed to deploy and utilize appropriate resources to protect President Trump in advance planning even though the "[l]ack of adequate resources is an unacceptable excuse for failing to improve advance precautions in this crucial area of Presidential protection" (*See e.g.,* Warren Commission Report at Chapter 8);

xx.     by taking and/or failing to take other actions to be proven through discovery or at the trial in this matter, which were in contravention of the exercise of due care, and reasonable

25

prudence under the circumstances and/or constituted violations of applicable policies and procedures; and/or,

yy.    the USSS committed other failures, and was otherwise negligent, reckless and/or careless, all of which, individually and/or jointly, in whole or in part, allowed a gunman to fire eight shots at President Trump from the roof of the AGR Building which severely, permanently and grievously injured the Plaintiff David Dutch, all for which the defendant United States is jointly and severally liable.

72.    As a direct and proximate result of the acts and/or omissions of the USSS, for which the defendant United States is jointly and severally liable, Plaintiff David Dutch suffered grievous, serious, permanent and debilitating personal and other injuries including but not limited to: present and future economic and non-economic loss, severe, serious, permanent and grievous personal injuries, pain, suffering, mental anguish, discomfort, inconvenience, distress, embarrassment, humiliation, loss of the ability to enjoy life's pleasures, loss of the marital relationship, disfigurement, medical expense loss both past and future, losses associated with ongoing medical care, loss of earnings and earning capacity, including past and future losses with respect thereto, loss of care, society, consortium, painful and continuing physical and other rehabilitation and therapy, and all of the sequalae therefrom, and was required to undergo severe, serious and painful surgeries and medical care, was admitted to the ICU for in-patient hospital admissions, and was required to undergo numerous surgeries for a gunshot wound ("GSW") including, but not limited to, GSW right upper quadrant with exit wound; right hemopneumothorax; Significant Grade 5 liver laceration extending from segment 4b through 7 with diffuse veinous bleeding; repair of liver laceration and diaphragm injury; liver packing and abthera wound vac; lateral detachment and avulsion of the diaphragm; shattered rib near the projectile wound; diaphragm injury with open

26

wound into cavity; veinous bleeding; ballistic injury to the right hepatic lobe with multiple clips in the right hepatic lobe; multifocal arterial injury to the right hepatic lobe hemothorax; upper lobe pulmonary contusion; large amount of free air in the abdomen and pelvis compatible with recent laparotomy; multiple ballistic fragments in the right 7th and 8th ribs; multifocal arterial injury to the right hepatic lobe; laparotomy, exploratory repair liver laceration; repair of diaphragm liver injury; open puncture wound to abdomen and abdominal washout and abdominal closure; intrahepatic bile leak; placement of numerous drains, tubes, omental and other patches; acute blood loss anemia; acute pulmonary insufficiency; diffuse right lobe liver parenchymal abnormality (hyperemia/delayed washout); remaining bullet fragments and shrapnel; biliary sphincterotomy; painful and continuing diagnostic and imaging testing; colonic anastomosis; transection of colon; transverse end colostomy; abscess repair; staph infection; biliary and pancreatic duct stent and removal; underwent painful inpatient and outpatient rehabilitation, and will be required to undergo additional future surgeries and medical care including rehabilitation, as well as other painful and required surgical procedures, all resulting in additional damages, including, but not limited to, all of the categories and elements of damages set forth above, as well as any other damage allowed under applicable law, all as a result of being shot by a high powered assault rifle at the Butler Presidential Rally on July 13, 2024, with no negligence on the part of Plaintiff David Dutch contributing thereto.

WHEREFORE, Plaintiff David Dutch prays for judgment against the defendant, United States of America, jointly and severally, for compensatory damages in excess of One Hundred Fifty Thousand ($150,000.00) Dollars, exclusive of interest, costs and attorneys' fees and for such other further relief as this Court deems just.

27

**COUNT II ON BEHALF OF PLAINTIFF SHEREE DUTCH**
**(NEGLIGENCE AGAINST DEFENDANT UNITED STATES OF AMERICA)**

73.    Plaintiffs incorporate by reference paragraphs 1 through 72 as though fully set forth at length herein.

74.    The assassination attempt, shooting and injuries of Plaintiff David Dutch, which has caused damages to the Plaintiff Sheree Dutch, were caused, in whole or in part, by the negligence, recklessness and/or carelessness of the USSS, for which defendant United States is jointly and severally liable in that, amongst other things, the USSS:

a.    failed to provide adequate security to the attendees at the Butler Presidential Rally, specifically including to Plaintiff David Dutch;

b.    failed to ensure that the AGR Buildings were secure despite its responsibility to do so, especially because the AGR Complex provided a direct line of sight to the stage where President Trump was to speak;

c.    failed to develop and/or implement an adequate Site Security Plan;

d.    failed to properly conduct advance planning at the site of the Butler Presidential Rally which exposed the attendees at the event, specifically including Plaintiff David Dutch, to grave injury;

e.    failed to mitigate line of sight dangers;

f.    failed to properly and adequately communicate, brief, work with and/or assign LLE to ensure that the attendees at the Butler Presidential Rally were safe;

g.    failed to properly delineate and/or establish responsibilities between LLE and the USSS despite that it was the responsibility of the USSS to do so;

28

h.      failed to provide appropriate guidance to LLE concerning its responsibilities at the Butler Presidential Rally;

i.      improperly positioned USSS and LLE personnel throughout the Butler Presidential Rally including within the AGR Building, but allowed the roof of the building to remain unsecured providing a prime sniper position for the Shooter;

j.      failed to secure and control the immediate airspace in the vicinity of the rally;

k.      failed to provide and/or utilize required and necessary technology, manpower and/or assets, including, but not limited to, the C-UAS which if properly employed – as was required – would have alerted the USSS that the Shooter operated a drone over the rally site hours before the shooting which would have allowed USSS to interview and question the Shooter thereby preventing the shooting;

l.      failed to and/or inadequately trained the C-UAS operator such that the agent was unprepared for any technical failure(s) of the equipment;

m.      failed, specifically including the C-UAS operator, to test the C-UAS equipment in advance of the rally to ensure that it was operational despite the agent's responsibility to do so, particularly as the USSS alerted others responsible for site security that the C-UAS would be used in the days leading up to the Butler Presidential Rally, creating dependence on a non-existent security asset;

n.      failed to establish proper lines of communication, including, but not limited to, failed to ensure that all law enforcement personnel responsible for site security were communicating appropriately, and/or failed to timely and widely disseminate critical security information;

o.      failed to adequately secure and protect the site of the Butler Presidential Rally (both "inside" and "outside" established perimeters);

p.      failed to secure, monitor and/or control a known and identified high-risk area at the venue of the Butler Presidential Rally, specifically the AGR Building and grounds which, among other things, provided a potential gunman with a clear line of sight to the stage where President Trump was speaking and also provided an elevated position from which to fire shots;

q.      failed to communicate to President Trump's USSS Security Detail prior to the President taking the stage that a suspicious individual was identified at the Butler Presidential Rally, including that a BOLO was issued for said individual who ultimately attempted to assassinate President Trump, injuring Plaintiff David Dutch;

r.      failed to advise President Trump's USSS Security Detail of the suspicious behavior of the Shooter after President Trump took the stage so that his security detail could immediately remove him from danger, thereby preventing the shooting;

s.      improperly assigned inexperienced and/or inadequately trained personnel to critical security assignments involving significant security responsibilities for which they were inadequately trained, ill equipped and unable to carry out;

t.      in providing site security at the Butler Presidential Rally, violated numerous USSS policies and procedures, including, but not limited to, USSS Office of Protective Operations ("OPO") Manual OPO-3, OPO-6, OPO-8, SOD-08, the USSS Strategic Intelligence and Information Manual CSD-04, USSS Internal Operating Procedures: Counter Sniper Team Advance Procedures, and other Policy and Procedure Manuals and requirements;

u.      provided improper and inadequate training to USSS personnel assigned to the Butler Presidential Rally;

30

v.     improperly and inappropriately deferred significant security responsibilities to LLE without appropriate communication despite that it is, and was, the function and responsibility of the USSS to ensure that the Butler Presidential Rally was safe for all attendees;

w.     failed to ensure that USSS counter-sniper agents adequately covered the AGR Complex, especially because of the proximity and direct line of sight from that vantage point to the stage where President Trump spoke;

x.     failed to maintain security over the event, including that even though it was prohibited from delegating ultimate security responsibility, the USSS failed to specifically and/or adequately advise LLE that the security of AGR Complex was LLE responsibility if that was its intention;

y.     improperly allowed fragmented, broken and/or inadequate lines of communication to exist which severely impeded the transmission of critical safety and security information prior to the shooting;

z.     improperly allowed separate command posts to be established which further prevented the timely dissemination of critical security information and/or failed to staff USSS personnel within the LLE command post;

aa.    improperly failed to centralize a single command center where information can be timely and appropriately disseminated to all personnel providing security;

bb.    improperly allowed critically important safety communications to take place over cell phones as opposed to radio which impeded and delayed the timely exchange of important security and safety information;

cc.    fragmented communication system prevented USSS personnel from sharing critical information timely and accurately to prevent the shooting, which, amongst other things, allowed

31

certain USSS agents to be made aware of the Shooter but not others, while failing to widely and timely share this information;

dd.    failed to specifically assign either USSS personnel and/or LLE personnel to the roof of the AGR Complex given its proximity and direct line of sight to the stage where President Trump spoke;

ee.    improperly allowed LLE counter-sniper personnel to define their own roles and positions despite that it is the sole responsibility of the USSS to delineate and assign those responsibilities;

ff.    improperly conducted advance site procedures including, but not limited to, walkthroughs to ensure that the AGR Complex was secure;

gg.    improperly allowed LLE counter-snipers to be located within the AGR Building as opposed to securing the roof;

hh.    was specifically aware, or should have been aware, that the roofs of buildings located within the AGR Complex were unsecure contrary to policy and procedure;

ii.    improperly failed to assign a USSS counter-sniper team to monitor the AGR Complex and its roofs, especially given its proximity to the event and direct line of sight to the stage;

jj.    despite the USSS's mandate and ultimate responsibility for securing the site for the Protectee and attendees of the event, the USSS utterly failed to develop and implement a proper Site Security Plan to protect all individuals at the Butler Presidential Rally;

kk.    failed to mitigate a clear and direct line of sight to the stage contrary to policy and procedure;

ll.       failed to adequately and timely transmit information to President Trump's Security Detail that would have either prevented President Trump from taking the stage or removed him from the stage prior to the time shots were fired;

mm.      failed to share threat assessment information with the USSS agents responsible for site security at the Butler Presidential Rally, including that President Trump was the subject of death threats;

nn.      improperly missed several opportunities to detain the Shooter despite that it was known that he was acting in a highly suspicious manner well before the shooting;

oo.      due to a lack of manpower, inexperienced personnel from agencies outside the USSS were given significant security responsibilities despite that they were inadequately trained to carry out those responsibilities, all in violation of the USSS's security responsibilities;

pp.      the Site Security Plan for the Butler Presidential Rally failed to define clear roles, responsibilities and a chain of command reporting and communication structure;

qq.      the USSS has ultimate responsibility for security planning at protective venues, including specifically the Butler Presidential Rally, and the USSS failed in this responsibility;

rr.       failed to communicate with all LLE's that aided in site security for the Butler Presidential Rally, and this failure allowed unacceptable gaps in the security that the USSS was required to provide;

ss.      the site of the Butler Presidential Rally presented important line of sight concerns which were required to and could have been mitigated by the USSS, but the USSS failed to alleviate or mitigate these concerns;

tt.       failed in key objectives of a Site Security Plan and failed to conduct the necessary and required due diligence to make the site safe for attendees;

33

uu.     failed in its primary objective of preventing direct line of sight sniper positions which were a known, clear and identifiable threat to President Trump;

vv.     failed in its long-standing mission and failed to implement procedures learned from prior assassination attempts, including that the USSS failed to give heightened attention to certain buildings involving higher risk than others;

ww.     failed to deploy and utilize appropriate resources to protect President Trump in advance planning even though the "[l]ack of adequate resources is an unacceptable excuse for failing to improve advance precautions in this crucial area of Presidential protection" (*See e.g.,* Warren Commission Report at Chapter 8);

xx.     by taking and/or failing to take other actions to be proven through discovery or at the trial in this matter, which were in contravention of the exercise of due care, and reasonable prudence under the circumstances and/or constituted violations of applicable policies and procedures; and/or,

yy.     the USSS committed other failures, and was otherwise negligent, reckless and/or careless, all of which, individually and/or jointly, in whole or in part, allowed a gunman to fire eight shots at President Trump from the roof of the AGR Building which severely, permanently and grievously injured the Plaintiff David Dutch, which resulted in damages to the Plaintiff Sheree Dutch, all for which the defendant United States is jointly and severally liable.

75.     As a direct and proximate result of the acts and/or omissions of the USSS, for which the defendant United States is jointly and severally liable, Plaintiff Sheree Dutch, suffered damages for past, present and future loss due to the severe, serious, permanent and grievous injuries sustained by her husband, Plaintiff David Dutch, as a result of the shooting complained of herein, including, but not limited to, losses of companionship, consortium, loss of the marital relationship,

34

loss of marital fellowship, losses of company, society, cooperation, affection, support, comfort, assistance, mental and other anguish, loss of sexual relations, economic losses (past and future), and/or bystander, zone of danger or other similar damages, and all of the sequalae therefrom, as well as any other damage allowed under applicable law, all as a result of her husband's injuries sustained at the Butler Presidential Rally on July 13, 2024, with no negligence on the part of Plaintiff Sheree Dutch contributing thereto.

WHEREFORE, Plaintiff Sheree Dutch prays for judgment against the defendant, United States of America, jointly and severally, for compensatory damages in excess of One Hundred Fifty Thousand ($150,000.00) Dollars, exclusive of interest, costs and attorneys' fees and for such other further relief as this Court deems just.

Dated: June 1, 2026

Respectfully submitted,

By:

Joseph Feldman, Esq. PA Bar ID: 325234
Nicholas Feldman, Esq. PA Bar ID: 323226
Feldman Law Group, PLLC
1322 5th Avenue
Coraopolis, Pennsylvania 15108
Telephone: (412) 262-6181

and

Douglas A. Latto, Esq. *(Pro hac vice to be submitted)*
Jeanne M. O'Grady, Esq. *(Pro hac vice to be submitted)*
Speiser Krause, PC
800 Westchester Avenue, Suite S-608
Rye Brook, New York 10573
Telephone:    (914) 220-5333

Richard E. Genter, Esq. *(Pro hac vice to be submitted)*
Speiser Krause, PC
2617 Huntingdon Pike
Suite 101
Huntingdon Valley, Pennsylvania 19006
(215) 884-8190

Attorneys for Plaintiffs

36